**SOUTHWEST WELDING & MANUFACTURING COMPANY**
v.
**The UNITED STATES.**
No. 183–65.

United States Court of Claims.
July 16, 1969.

---

Thomas H. Carver, Los Angeles, Cal., attorney of record, for plaintiff.

John C. Ranney, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant. Alfred H. O. Boudreau, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS,

SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Louis Spector with directions to make recommendation for conclusions of law under the order of reference and Rules 57(a) and 99(c) on plaintiff's assignment of errors. The commissioner has done so in an opinion and report filed on August 23, 1968, wherein such facts as are necessary are stated. Exceptions to the commissioner's opinion and report were filed by defendant and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover and further proceedings of this court are stayed pursuant to Rule 100 for a period of 90 days to afford the parties an opportunity to obtain an administrative resolution by the Board, or the contracting officer, of the equitable adjustment to which plaintiff is entitled under the "Changes" clause contained in the contract. Further action by the court will

be deferred pending the outcome of these administrative proceedings.

## OPINION OF COMMISSIONER

SPECTOR, Commissioner:

The petition herein presents a contract claim in the amount of $543,343.76. It arises out of an agreement dated April 30, 1957, between plaintiff and the United States acting through the Corps of Engineers of the Department of the Army. The contract covered construction of penstocks and surge tanks in power plant units 4 and 5 of the huge Garrison Dam Project, Riverdale, North Dakota.

These penstocks were designed to convey water from an artificial lake to a turbine employed in the generation of electricity. Each penstock consisted of 36 sections. A section was created by forming and welding steel plate approximately 1 inch thick, into a tubular form about 60 feet long and 24 feet in diameter. Because of their size (which militated against manufacture elsewhere and shipment by common carrier to the project site), and because of the need to develop a mass-production type of welding procedure, these sections were formed and welded from rolled plate in a fabricating shop erected by the contractor at the job site. Thereafter, they were installed within an existing reinforced concrete lined tunnel, 29 feet in diameter, to form a penstock 1600 feet in length, 1300 feet of which was within the concrete tunnel. Each penstock was connected to two surge tanks, which were each about 135 feet high, by 65 feet in diameter.

For a better understanding of the facts which follow, it should be observed at the outset that this is a review[1] of two administrative decisions denying the claim. These decisions were issued by a Board of Contract Appeals representing the Chief of Engineers of the Army. On civil works construction (as distinguished from military construction), he is the duly authorized representative of the Head of the Department referred to in the "Disputes" article contained in this contract.

The issue involved is quite succinctly stated in the first of these administrative decisions, as follows:

The Contracting Officer, for reasons which he deemed sufficient, ordered the contractor to remove and replace all welds accomplished in the fabricating shop by using a single pass technique with twin arc automatic welding machines. The welds had been examined radiographically in the fabricating shop and passed by the Government inspectors. The appellant protested this order but performed the work as directed after giving notice to the Contracting Officer that it would be considered extra work. * * *

The administrative record underlying the aforementioned decisions of the Engineers Board is usually large. It features, for example, eight volumes and 2,154 pages of transcript at an initial hearing, plus four additional volumes totaling 650 pages at a supplemental hearing, plus interrogatories, depositions, and finally, 140 additional pages of transcript. This is surprising because the hearings had been preceded by a comprehensive stipulation of facts, and for the further reason that the Assignment of Errors and Response present no serious issues of fact. On the contrary they, and the accompanying briefs, demonstrate that the dispute herein revolves about the meaning of various contract provisions establishing testing and performance standards for the welding, of the contract terms relating to inspection and post-inspection rights of the parties, and the application of those various contract provisions to undisputed facts. These are fundamentally issues of law, and as stated recently by this court, the administrative decisions in such cases are "not binding on us, but the question may be

---

1. As contemplated by the Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321–322 (1964 ed.).

determined for ourselves under Section 2 of the Wunderlich Act."[2]

The facts narrated above, and hereinafter, are summarized from a comprehensive and lengthy stipulation [3] entered into between the parties prior to the aforementioned hearings. Plaintiff, as a matter of fact, was willing to rest on that stipulation, but hearings were conducted at the Government's election.[4] The recitation of facts in the Board's decision also states that it relies on that stipulation.[5]

There are two so-called exceptions to the stipulation which are virtually one and the same. They do not detract from the stipulation because they merely reserve that which is the primary issue in this case, namely, whether or not plaintiff's work was defective when measured against the standards of testing, inspection, and performance prescribed by the specifications, and the other contract terms drafted by the Government.

Thus, the parties agree that the welding in question exhibited certain characteristics or "manifestations" or "indications" which are the subject of the dispute between them. The contractor asserts that they are not rejectable defects or cracks within the meaning of the contract, and the Government insists that they are. Similarly, the Government asserts that the weld removal which it ordered constituted a "repair," that term being consistent with the concept of a rejectable defect. Plaintiff prefers to characterize the work which it performed under protest as a "replacement." [6]

As above recited, each penstock was comprised of 36 sections. But this case is concerned solely with the welding of sections 2 to 15 of each penstock. Since welding was accomplished on both the exterior and interior of the sections, there were 95,802 inches of welding performed on the longitudinal seams and 253,314 inches of welding performed on the girth seams of these sections alone.

The work of welding plates together to form sections of the penstocks began in the contractor's fabricating shop on September 5, 1957. When the sections were completed, they were examined by Government inspectors in accordance with the provisions of the contract.

The pertinent provisions, as recited in the stipulation, are General Provision 9, General Condition 19, Technical Provisions 5–03b, and 6–05c(1). General Provision 9, "Inspection," is part of the Government-wide, standard, construction contract form. It provides in pertinent part as follows:

(a) Except as otherwise provided in paragraph (d) hereof all material and workmanship, if not otherwise designated by the specifications, shall be subject to inspection, examination, and test by the Contracting Officer at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. \* \* \*

Paragraph (d) referred to as an exception to paragraph (a), provides as follows:

(d) Inspection of material and finished articles to be incorporated in the work at the site shall be made at the place of production, manufacture, or shipment, whenever the quantity

---

2. Paccon, Inc. v. United States, 399 F.2d 162, 185 Ct.Cl. 24 (1968). See also Morrison-Knudsen Co. v. United States, 397 F.2d 826, 184 Ct.Cl. 661 (1968).

3. Administrative Record, Part IV.

4. Plaintiff's Assignment of Errors, pp. 4 and 33.

5. Administrative Record, Part XX, p. 14.

6. Interestingly, and as later covered in more detail, the Board's opinion refers to these indications as "defects which the Contracting Officer has classified as cracks." In the opinion thereafter, it does not directly confront this reserved issue of whether or not they were rejectable defects within the meaning of the contract. On the other "exception" to the stipulation, the Board's opinion itself recites that the contractor was ordered to "remove and replace all welds \* \* \*."

justifies it, unless otherwise stated in the specifications; and such inspection and written or other formal acceptance, unless otherwise stated in the specifications, shall be final, except as regards latent defects, departures from specific requirements of the contract, damage or loss in transit, fraud, or such gross mistakes as amount to fraud. \* \* \*

General Condition 19 of the specifications annexed to the contract, is also entitled "Inspection," and provides as follows:

> The work will be conducted under the general direction of the Contracting Officer and is subject to inspection by his appointed inspectors to insure strict compliance with the terms of the contract. No inspector is authorized to change any provision of the specifications without written authorization of the Contracting Officer, nor shall the presence or absence of an inspector relieve the Contractor from any requirements of the contract. As soon as practicable after the completion of the entire work or any divisible part thereof as may be designated in these specifications, a thorough examination thereof will be made by the Contracting Officer at the site of the work. If such work is found to comply fully with the requirements of the contract, it will be accepted and final payment therefor will be made in accordance with the clause of the contract entitled "Payments to Contractors."

The substance of Technical Provisions 5–03b and 6–05c (1) is as follows:

> (1) The contracting officer was authorized to cut coupons from any location in any joint for testing (Technical Provision 5–03b.)

> (2) The entire length of all joints in the penstocks would be prepared and radiographically examined in accordance with UW–51 of the American Society of Mechanical Engineers Boiler Code. (Technical Provision 6–05c (1).)

ASME Boiler Code UW–51(d) requires the weld to be "radiographed with a technique which will indicate the size of defects having a thickness equal to and greater than 2 per cent of the thickness of the base metal." "Thickness" in reference to the plate, and "thickness" in reference to the defect, as used in these specifications, is a dimension in the same direction, i. e., in the direction of the taking of the x-ray and perpendicular to the plate. Since the thickness of the base metal varied from $\frac{7}{8}''$ to $1\frac{1}{4}''$, the contractor was required to radiograph with a technique which would disclose defects varying from .0175″ for the $\frac{7}{8}''$ plate to .025″ for the $1\frac{1}{4}''$ plate.

As the plates were welded by the contractor at the fabrication shop, the place of production, the contracting officer ordered each section subjected to a radiographic (x-ray) examination, and also ordered that coupons be cut from joints. Defects found by the Government inspectors upon the radiographic examination or by visual examination, or otherwise, were then repaired by the contractor in the fabricating shop. When the welding had been inspected and finally approved by the Government inspector, he signed the radiographic record of the welding for that particular section. After certain grinding and repair of pitting on the penstock sections' surface had been completed, a process termed "doll up," the inspector cleared the section and it moved from the shop to the yard. There it was sand blasted and painted on the outside.

As a matter of usual job practice, the Government inspector marked such a section "OK." The contractor's project manager marked the section "sold," and listed the date of clearance by the Government inspector in the job diary. The sections were then transported by trailer to the penstock tunnel, which was located approximately 1 mile from the fabricating shop. Once installed in the tunnel the sections were joined together by manual welding to form the penstock. The penstock sections which are the subject of this dispute, had all been thus

installed within the penstock tunnel when the welding was ordered to be replaced.

About a year prior to the award of this contract, the plaintiff had successfully completed a similar contract for the fabrication and erection of penstocks and surge tanks for power plant units 1, 2, and 3. The design, drawings, and specifications for that contract were similar to those for the units 4 and 5 involved in the instant contract. The same welding procedure had been employed on both contracts, and the steel for both contracts was purchased under the same specifications. However, the steel employed in units 1, 2, and 3 was produced by the Gary, Indiana, mill of the U. S. Steel Corporation, whereas the steel employed in this contract was supplied by the Coatesville, Pennsylvania, mill of the Lukens Steel Company.

Prior to the commencement of welding, plaintiff had qualified his welding procedure, as required by the contract, by submitting to the contracting officer for approval the procedure specification for the submerged arc welding of the penstock seams. This submittal was in the form of three drawings, all of which were approved. Thereafter, the plaintiff qualified the procedure specification and submitted the test result to the contracting officer in the form of three additional groups of documents, teamed "files," pursuant to Technical Provision 5–03c. The indicated results met the requirements of the specifications and "were entirely satisfactory to the Contracting Officer." The same welding procedure proposed by the contractor on these drawings and in these documents had been employed on the penstocks for units 1, 2, and 3, under the aforementioned prior contract, where that procedure had also been found to be satisfactory.

The contract between the plaintiff and the Lukens Steel Company for the steel plate, incorporated the Government's specifications for the steel, and provided that it would be subject to inspection by the Government. The plaintiff, in ac-cordance with General Provision 8 of his contract with the Government, provided the contracting officer with mill test reports. Based upon the mill test reports (certified by Lukens Steel Company), measurements, and visual observation, the steel plate produced by the Lukens Steel Company for this contract was approved as being in accordance with the contract specifications by inspectors for the Government at the mill at Coatesville, Pennsylvania, prior to shipment to Riverdale, North Dakota. The approval was based upon all of the information available to the inspectors, and such visual and physical tests as were required by the Government specifications. The certified mill reports furnished by the contractor showed that the steel plate produced by Lukens accorded with the specifications of the contract. The contractor did not maintain a resident representative at the mill in Coatesville, Pennsylvania, where the steel was produced and the plates fabricated, but two officials of the contractor also inspected the plates at the mill prior to shipment.

The first section of unit 4 was radiographically inspected and approved by the Government inspectors on October 21, 1957. By March 7, 1958, the contractor had completed welding on the first 15 sections of unit 4 and this welding had been radiographically inspected and approved by the Government inspectors. Section 1 of unit 4 was moved into the tunnel area on November 5, 1957. Section 2 was moved into the tunnel area on January 20, 1958, and by April 18, 1958, the first 15 sections of unit 4 had been moved into the tunnel area and joined together.

The first section of unit 5 was radiographically inspected and approved by the Government inspectors on October 22, 1957. By March 24, 1958, the contractor had completed welding on the first 15 sections of unit 5 and this welding had been radiographically inspected and approved by the Government inspectors. Section 1 of unit 5 was moved into the tunnel area on November 12, 1957. Sec-

tion 2 was moved into the tunnel area on January 25, 1958, and by April 25, 1958, the first 15 sections of unit 5 had been moved into the tunnel area and joined together.

The contractor had, however, experienced considerably greater difficulty working with the steel plate obtained from Lukens than it had experienced under the previous contract employing the steel of another manufacturer. In correspondence relating to this transaction, Lukens had stated that "it is the advice of our metallurgist that this quality of steel in gauges ½" and heavier might indicate an unusual number of cut-outs necessary after x-ray."

The plaintiff experienced difficulty in welding the steel plate obtained from Lukens utilizing the previously successful and approved "single-pass" automatic welding procedure because the plate was not of a uniform consistency, and the bevels, edges, and grooves were irregular. In the course of fabricating sections 2 to 15, the contractor found that it was obliged, after radiographic inspection, to cut out and repair approximately 10 percent of the welding to remove "indications" characterized by the Government inspectors as rejectable defects. This resulted in additional expense to the contractor because much of the repair was accomplished by manual welding, and the repairs delayed the orderly fabrication of the individual sections on an assembly line basis. There was considerable correspondence between plaintiff and Lukens during this period, with the plaintiff complaining of the appreciably higher cost of welding the same quantity of steel over that which had been experienced on units 1, 2, and 3, and with Lukens responding that "the material shipped through this period of time has been inspected and approved by the resident U. S. Army Corps of Engineers and on this basis assumed by us to comply with the specifications." This controversy between plaintiff and Lukens was finally compromised following a suit by Lukens for the purchase price of the

steel and the costs above described are presumed not to be at issue in this case.

Meanwhile, back in November 1957, the contractor had begun a program of experimentation to determine whether a modified welding procedure could reduce the expense of the project by improvement of the automatic welding process, and reduction of the abnormal quantity of manual welding required. Because the steel had been accepted by Government inspectors at the mill as meeting the Government specifications, and because of the need to maintain job progress and avoid assessment of liquidated damages, plaintiff had concluded that it was not feasible to order plate from another mill.

By March 23, 1958, the contractor had concluded its experimentation, and it began to employ a procedure which may be described as "multi-pass" welding. The new method produced fewer of the "indications" which the Government inspectors had characterized as rejectable defects, following radiographic examination. Hence this new welding procedure was submitted to the contracting officer for formal approval on April 22, 1958, in the form of two groups of documents called "files," and revised "multi-pass" procdure was formally approved on May 21, 1958. It was thereafter employed in the fabrication of sections 16 to 29 of both units 4 and 5. Those sections are not involved in this claim.

Despite the excessive rate of repair, the first 15 sections of each unit had been, as previously described, radiographically inspected and reinspected, and then accepted, sand blasted, painted, moved to the concrete tunnel, and installed therein. But the contracting officer had meanwhile directed the plaintiff to take trepanned plugs from welds previously radiographed and found acceptable by the Government inspectors. On January 7, 1958, the contracting officer requested plaintiff to cut three plugs from circumferential welds in section 10 of penstock 4. The three plugs were polished, and deep etched with acid, following which the contracting officer

concluded that in his opinion each plug contained a "crack."

Also, in January 1958, the contractor cut 12 trepanned plugs from welded seams on penstock 5, sections 2, 5, and 6, and these plugs were similarly polished and deep etched by Government inspectors. Four of these plugs did not exhibit any inclusion or crack or other defect even when measured against the Government's definition of a defect. Seven of the plugs exhibited the manifestations characterized by the Government as defects. The remaining plug exhibited an indication which could not be identified from its photograph.

On February 5, 1958, the contractor cut three trepanned plugs from welded seams on penstock 4, section 15, and these were also polished and deep etched by the Government inspectors. They exhibited the characteristic described by the Government as a crack.

In the period February 23 to February 27, 1958, a Professor Charles Martin, of Rocky Mountain State College, Billings, Montana, visited the project as a metallurgical consultant for the contractor, and he observed the welding procedures. On March 7, 1958, the chief of the construction division advised plaintiff of his concern, and stated that he had not been assured that all cracks and defects had been discovered and removed, or that the defects were not detrimental. At that date, the Government inspectors had radiographically inspected and approved sections 1 to 15 of unit 4 and sections 1 to 10 of unit 5. Sections 1 to 8 of unit 4 and sections 1 to 7 of unit 5 had been moved into the tunnel area.

At a meeting on March 10, 1958, Professor Martin reported that the typical "micro-fissures" which the Government described as "cracks" were not detrimental. Professor Martin advised that when gouged with an arc-air torch, the alloyed material melted before the basic steel plate because it had a melting temperature 280° below the welding temperature of the steel. This created the appearance of a "crack" or

"separation." Similarly, in etching plugs or specimens, the acid first attacked the alloyed material and by chemical reaction removed good metal, leaving the appearance of a crack.

The reason for this condition was that sulphur was drawn from the steel into the weld metal as a result of the high heat input from the tandem-arc process. This formed an alloyed material described as a sulphide condition. The alloyed material was metallic, a solid and not a void, as would be the case with non-metallic inclusions. Accordingly, it had some strength. Professor Martin concluded that the "micro-fissures" would not have a critical effect upon the penstock, and this conclusion was confirmed by a welding expert, Mr. Norman Schreiner of the Linde Air Products Division of the Union Carbide Corporation.

It was the contractor's position at this conference that the penstock sections were free of defects normally considered detrimental, that the radiographic (x-ray) examinations showed that the sections were acceptable, and that the applicable code requirements, including those incorporated into this contract, permitted porosity and slag inclusion in welds.

Nevertheless, the contracting officer, based on direction from higher authority, requested that a sample of sufficient size for tensile strength tests, bend tests, and chemical analysis, be cut from a seam of one section already installed in the tunnel. Accordingly, on March 12 and 13, 1958, additional trepanned plugs were cut from welds accomplished by the single-pass procedure, which the Government suspected might contain defects. The plugs were taken from sections which had been radiographically inspected and approved by the Government inspectors in the fabrication shop, and which had been removed to the yard or painting area, or were already installed in the tunnel.

The first of these plugs, when acid-etched, revealed no crack or other defect,

even under the Government's definition. After etching, the second plug "appeared to contain a crack," and in the opinion of the contracting officer this constituted a defect. The third plug was etched, and the notes of the Government inspector do not state that he found the existence of the characteristic which the Government has described as an inclusion or crack. As to the fourth plug, the notes of the Government inspector, after acid-etching, state "[t]his plug was among others taken to determine adequacy of welding procedure. The etched plug revealed unsatisfactory welding process." The fifth and last plug, after etching, exhibited the characteristic which has been described by the Government as an inclusion or crack.

On March 31, 1958, the contracting officer employed a Dr. Samuel L. Hoyt, a metallurgical consultant associated with Batelle Institute, Columbus, Ohio. Dr. Hoyt requested that three coupons be sent to him for testing. The first of these was a 12″ diameter plate containing a weld which had been made by the single-pass method. The second one was a plate which contained a "multiple-pass" weld accomplished by the revised welding procedure above described. The third was a sample of steel plate employed on the prior contract for units 1, 2, and 3, welded by the single-pass method.

On June 9, 1958, Dr. Hoyt reported that he had tested the first of the above described samples for tensile strength, bend, and charpy "V-notch." He concluded as follows:

In the sample which was submitted as representative, the defect is identified as a crack. This crack makes the weld definitely unsound.

Tests for notch behavior indicate that both the steel and weld metal are notch brittle at 32° F. which is approximately the low service temperature of the penstocks. It is concluded from observations of the effect of this weld crack on the mechanical behavior of the weld that penstocks in which this defect occurs are not reliable for service.

It is clear from the record that Dr. Hoyt had not been asked to make these tests and this report, utilizing as a measure the provisions and performance standards of this particular contract. His tests and report were quite independent of the contract provisions, as illustrated by his testimony quoted in plaintiff's Assignment of Errors (p. 108, *et seq.)* and Rebuttal (p. 34).

Based on earlier oral advice to the plaintiff that Dr. Hoyt had condemned all welds performed with the single-pass twin arc automatic procedure, the contractor had observed that "Dr. Hoyt's findings are based on a single test specimen which may not be representative of the many thousands of feet of weld which he has condemned."

On June 2, 1958, the contracting officer directed the plaintiff to remove seven additional 12″ diameter test specimens, and these were sent to Dr. Hoyt who tested them and reported formally on August 14, 1958, as follows:

These supplementary tests confirm those of the first three samples as well as the conclusions of the report of June 9, 1958. Accordingly, it may again be stated that the weld crack in the "single pass" welds makes the penstocks unsafe for test and service. Furthermore, though this cannot carry the weight of a conclusion, the current "multiple pass" welds gave no evidence in these tests of the presence of the defect or of any harmful effect on the welds.

There is no indication (and this is confirmed by Dr. Hoyt's testimony cited above) that these tests and this report were in any way related to the provisions and performance standards of this contract.

Earlier than some of the above described developments, and specifically on May 23, 1958, the contracting officer had advised the plaintiff by letter:

The test results indicate that the weldments using the single pass technique with the twin arc automatic welding machine are unsatisfactory.

To preclude the possibility of failure, it will be necessary to replace all welds accomplished by the above procedure. You are requested to advise me as to your plans for replacing the welds.

The contractor protested this order "and asserted, on several occasions, that there was no evidence, and no provision of the contract, that would justify such an order."

These protests of the contractor were considered at a conference held on July 28, 1958. In attendance were representatives of all of the interested parties. A representative of the Lukens Steel Company stated that he had tested the plate supplied to the contractor and welded with the "single-pass" welding procedure for tensile strength, bend, charpy, and "V-notch," that is, for the same elements examined by Dr. Hoyt. The tests conducted by Lukens Steel Company showed that the tensile strength on welded specimens containing a manifestation (characterized as a "crack" by the Government), was higher than the result obtained by Dr. Hoyt. The written report of the Lukens test showed, with respect to tensile strength, that only one of ten specimens which exhibited so-called cracks fractured within the weld metal. Photographs verified that most of the specimens broke in the steel plate rather than in the weld metal, even when large "cracks" were present. The weld metal also had a greater resistance to impact, that is fracture, than did the steel plate.

At this conference, the plaintiff also stated that the Government had examined the welds by radiograph, and all defects noted by the Government inspectors had been repaired, following which the Government inspectors had accepted each penstock section subsequently installed in the tunnel. The contractor asserted that there was no evidence that every inch of weld was unsatisfactory, and stated it was the responsibility of the Government to identify the specific welds that it felt required repair. In response, the contracting officer stated that the Government's tests indicated that all welds in the first 14 sections of each penstock were unsatisfactory, and "that the Contractor was obliged to demonstrate that such was not the case." [7]

When a representative of higher authority within the Government asked the plaintiff at this conference how the extent of any cracks could be determined, the contractor replied that the welding could be examined by supersonic or "ultrasonic" testing. The Government's consultant, Dr. Hoyt, agreed with the contractor that attacking the problem in this manner would be satisfactory, and said that he was not in favor of removing all the weld metal if any other method possible could be proven.

Following this conference, and by letter dated August 1, 1958, the contractor proposed that the welds be examined ultrasonically, that all defects found be removed, and repairs accomplished by manual welding. In that letter, the contractor further observed:

The procedure to be actually used is to be determined by you and you are to issue definite specifications covering the repair work, which we will perform strictly in accordance with your specifications and instructions.

It is to be understood that we do not accept any liability for the repairs or the costs and expenses entailed in performing the repair work, and that all additional time required in making the repairs will necessitate an ap-

---

7. This concept of the burden of proof in these "inspection and rejection" cases, is not supported by the case law. When the Government rejects work as being not in compliance with its specifications, the Boards of Contract Appeals have held that the burden is upon the Government to demonstrate that fact. See, for example, American Machine & Foundry Co., ASBCA No. 10772, 68–1 BCA ¶ 6900; Hardeman - Monier - Hutcherson, ASBCA No. 11785, 67–1 BCA ¶ 6210; D. R. Kincaid, Ltd., ASBCA No. 8615, 65–1 BCA ¶ 4810; Gibbs Mfg. & Research Corp., ASBCA No. 9547, 1964 BCA ¶ 4515.

propriate extension of the contract completion dates.

In reply, dated August 14, 1958, the contracting officer advised:

The procedure you submitted is considered to be generally satisfactory; however, the responsibility for repairing the welds to a satisfactory condition rests with your company, irrespective of the approval of this office. In order to prove the effectiveness of the ultrasonic system, plugs or coupons should be taken from areas not revealing defects as well as from areas revealing defects.

You are therefore directed to proceed with the repair work in accordance with your suggested procedure except all welds, including repair welds, should be examined by the ultrasonic system in order to insure that the final completed welds are satisfactory.

No change order is necessary since the repair work does not constitute a change in the work required under the contract. The repair work is necessary to correct work previously performed by you under the contract, but which does not meet the standards required by the contract.

The liability for the unsatisfactory welds rests entirely with your company; therefore, the Government is neither obligated for the additional cost nor the time required to repair the welds.

This administrative dispute was now approaching its climax. The contractor acknowledged the foregoing directive from the contracting officer in a letter dated September 4, 1958, and stated that it had performed the welding in strict accordance with the drawings and specifications of the contract; that the welding had been inspected at the place of production and accepted by the Government; that replacement or repair of the welds in the penstock tunnel would be relatively very expensive; that if the results of the welding procedure had been rejected at the place of production it would have been relatively inexpensive to have replaced any welds found to be unsatisfactory, or not in accordance with the contract requirements; and that the ultrasonic method of inspection was not required by the specifications. The contractor concluded:

Upon completion of the ultrasonic examination conducted under the direction of your office, it will be possible to determine whether, in point of fact, it is necessary to repair or replace any portions of the welded seams in the penstock. In view of the report of Dr. Hoyt, dated June 9, 1958, that the steel supplied under the specifications of the contract is not sufficiently notch tough, it is possible that you may conclude that certain portions of the welded seams should be replaced. It would appear, from an examination of the contractual provisions set forth above, that if we are directed to repair or replace any portion of the welded seams in the penstocks that are now installed, this would also constitute a change of specifications and additional work, that can only be accomplished by a written order issued under General Provision 3.

In the interest of expediting the work on this contract, and to prevent delay, we will proceed immediately on the ultrasonic examination directed in your letter of August 1, 1958. It is our understanding of the contract that the cost of this examination, and the replacement or repair of the welded seams in the penstocks already installed will be paid by the Government, or that you will issue a written order changing the specifications to provide for ultrasonic examination, and the repair or replacement of certain portions of welded seams pursuant to your direction.

The contracting officer's reply of September 19, 1958, has been acknowledged by the parties as constituting the formal

contracting officer's decision contemplated by the standard "Disputes" article contained in this contract. The purport of this decision is that these were "performance" rather than "design" specifications,[8] and that the burden was therefore on the contractor to produce a result satisfactory to the contracting officer.

The decision continued to the effect that "we have no objection to your proposed procedure, providing it is proven that satisfactory results are being obtained. My letter did not direct you to make an ultrasonic or other examination of the welds prior to repair. * * * Any examination you wish to make prior to the repair is entirely at your option and not chargeable to the Government. Also, all repairs are to be accomplished at your expense."

In response to plaintiff's assertion that this welding had previously been accepted under General Provision 9(d), the contracting officer's decision cites General Condition GC–19 of the specifications earlier mentioned, to the effect that "[a]s soon as practicable after the completion of the entire work or any divisible part thereof as may be designated in these specifications, a thorough examination thereof will be made by the Contracting Officer at the site of the work. If such work is found to comply fully with the requirements of the contract, it will be accepted and final payment therefor will be made." Citing the requirement for a hydrostatic test to be performed on each penstock when finally installed within the concrete tunnel, the contracting oficer observed that acceptance of the entire structure was dependent upon that test, and could not be made prior thereto.

On October 20, 1958, the plaintiff appealed from this letter to the Head of the Department (represented by the Corps of Engineers Board of Contract Appeals). Therein the contractor reiterated that "[i]t is our firm opinion

that the welding procedure is specified in the Contract, that the welds are satisfactory, and comply with the specifications of the Contract, and that this is shown by the fact of their acceptance by the authorized government inspectors." The appeal concluded that "[i]t is our position that the welds you have ordered replaced will successfully pass the hydrostatic test. If there is any question as to this, the proper procedure, under the contract, is to perform the hydrostatic test and then determine if any weld repairs are necessary. It may be possible to promptly resolve this issue by performing a hydrostatic test now on the sections in which you have ordered the welds examined and replaced and which were completed and accepted by the government." This request for a hydrostatic test was rejected.

Because the contracting officer had earlier directed the plaintiff "to proceed with the repair work in accordance with your suggested procedure," the contractor entered into a contract with the Sperry Products Company for ultrasonic examination of the single-pass welds. It is stipulated that the Sperry Products Company "is generally considered to be the leading firm in the development of ultrasonic equipment for non-destructive testing of weldments."

On or about November 1, 1958, the contractor began an ultrasonic examination, and the replacement of welds where any of the alleged "defects" were indicated by such ultrasonic examination. However, on November 6, 1958, the contracting officer advised the plaintiff that the ultrasonic examination was not satisfactory, moving the contractor to reply on November 11, 1958, as follows:

Since radiographing did not disclose defects in welds which were inspected, approved and accepted by your authorized representatives and since you have concluded that the ultrasonic inspec-

8. For a discussion of the difference, see Hol-Gar Mfg. Corp. v. United States, 360 F.2d 634, 175 Ct.Cl. 518 (1966); Aero-dex, Inc., ASBCA No. 7121, 1962 BCA ¶ 3492.

tion method is unsatisfactory, there appears to be no alternative but to examine quadrants of the single pass penstock welds using the arc-air method. * * * In view of the fact that you are unable to indicate the location of defects in single pass welds you claim exist and which you claim are detrimental, we wish to inform you that a substantial footage of seams will have to be arc-air examined and repair welded, and that the majority of this footage, in our opinion, will have no defects. This procedure, however, is necessary, as there are no nondestructive methods of examination by which you can determine the location of the defects, and is beyond the requirements of the specifications.

On December 19, 1958, the contractor advised that he was proceeding with the repair work on the basis of the contracting officer's tacit approval of the procedure then being employed. This procedure consisted of arc-air gouging of the weld metal and base metal in each groove to the extent of approximately ¼″, and the rewelding of the groove. The metal was replaced by the manual metallic-arc-method, with low hydrogen type electrodes because it was being accomplished upon the penstock sections already in place within the concrete tunnel. After the weld removal and replacement had been completed, the work was radiographically and physically examined by the cutting of plugs. Any defects disclosed by Government inspection, under the Government's definition thereof, were repaired by the contractor. This procedure of manual removal and replacement of all of the welded seams continued through April 1959.

On or about May 11, 1959, the Government began its own ultrasonic examination of the replaced or repaired welds. This examination was performed by a company named Automation Instruments, Inc., under a direct contract with the Government. The Government was satisfied with the reliability of this ultrasonic inspection. In the course thereof, indications characterized by the Government as "defects" were found in some portions of the replaced welding, and these portions were again replaced by the contractor at the direction of the contracting officer. The rewelded portions were then again inspected ultrasonically and the process of rewelding and ultrasonic inspection continued until the contracting officer was satisfied that the welding was free of any defects which he considered objectionable.

The method of ultrasonic examination performed by Automation Instruments, Inc. differed from the aforementioned Sperry Products Company method in that water was employed as a couplant. The process had been developed by Automation sometime in 1956 for use in inspecting boiler tubing.

By the time the contracting officer adopted this nondestructive method of reinspection, the contractor had completed the replacement or repair by arc-air gouging of all single-pass welds on unit 4, and of all of the single-pass welds on the girth seams inside sections 2 through 8, 14, and 15, and part of the single-pass welds on the girth seams inside sections 9, 10, 11, and 13 of unit 5 in the two interior quadrants. The contractor had also repaired or replaced part of the outside girth seams of sections 8, 14, and 15 of unit 5.

On or about June 12, 1959, at the request of the contractor, the contracting officer directed Automation to perform an ultrasonic examination of the single-pass welds on unit 5 *in advance of* (and not after) the replacement or repair of the seams, and before they were arc-air gouged, as well as of the seams which had been replaced or repaired after arc-air gouging. Following this examination, the procedure for replacement or repair was modified by agreement so that the contractor was required to arc-air gouge and reweld only those portions of the single-pass welds on unit 5 that revealed indications upon ultrasonic examination.

The length of weld arc-air gouged and replaced, and the indications demonstrated by ultrasonic examination both before and after such arc-air gouging, are set forth below in tabular form:

TABLE IV.—*Total Length of Weld (Replaced, or Repaired) Prior to Ultrasonic Examination by Government*

|  | Longitudinal | Girth | Total |
|---|---|---|---|
|  | *Inches* | *Inches* | *Inches* |
| Unit 4: |  |  |  |
| Interior (2 quadrants) .......... | 23,823 | 62,873 | 86,696 |
| Exterior (2 quadrants) ......... | 23,823 | 62,873 | 86,696 |
| Unit 5: |  |  |  |
| Interior (2 quadrants) ......... | 0 | 59,063 | 59,063 |
| Exterior (2 quadrants) ......... | 0 | 26,241 | 26,241 |

The total length of "indications" shown by ultrasonic examination, whether conducted before, or after, the weld replacement, or repair, is shown as Table V, below:

TABLE V.—*Total Length of Indications Shown by Ultrasonic Examination of Government*

|  | Longitudinal | Girth | Total |
|---|---|---|---|
|  | *Inches* | *Inches* | *Inches* |
| Unit 4 [1] ..................... | 204.0 | 635.38 | 839.38 |
| Unit 5 [2] ..................... | 279.75 | 2,343.12 | 2,622.87 |
| Total .................. | 483.75 | 2,978.50 | 3,462.25 |

[1] After complete air arc gouging in all four quadrants.
[2] After complete air arc gouging in all four quadrants of 26,241 inches and air arc gouging of the remainder of the seams in the two interior quadrants.

That is, upon the ultrasonic examination of the Government there were "indications" of defects in 1.2% of the longitudinal weld seams and ⅜% of the girth seams (percentage of total length of "indications" to total length of seam), on sections 2 to 15 of unit 5, after such previous repair as is shown in Table IV, above. There were "indications" of defects in .86% of the longitudinal weld seam and 1.01% of the girth weld seam (percentage of total length of "indications" to total length of seam), on sections 2 to 14 of unit 4, after complete air arc gouging, and replacement, as indicated in Table IV, above.

TABLE VIII.—*Total Length of Weld Seams Repaired or Replaced After Ultrasonic Examination by Government on Seams Where Ultrasonic Examination Made in Advance of Air Arc Gouging (Unit 5)*

| Longitudinal (inside and outside) | | | Girth (inside and outside) | | |
|---|---|---|---|---|---|
| Length of seams | Length of repairs | Percent repairs | Length of seams | Length of repairs | Percent repairs |
| *Inches* | *Inches* |  | *Inches* | *Inches* |  |
| 24,078 | 279.75 | 1.16 | 37,543 | 1,678.75 | 4.47 |

The weld replacement or repair on unit 4 was completed to the satisfaction of the Government on or about June 7, 1959. Thereafter the penstocks and surge tanks of that unit were hydrostatically tested, and were accepted by the Government. Similarly, the weld replacement on unit 5 was completed to the satisfaction of the Government on or about August 15, 1959, and following a successful hydrostatic test, this unit was accepted on or about September 15, 1959.

It is stipulated, finally, that as a consequence of the orders of the contracting officer above outlined to replace or repair the welding, the plaintiff incurred substantial expense in direct labor, materials, equipment, and overhead. He has filed an affidavit in support of these costs. However, neither the contracting officer nor the Engineers Board of Contract Appeals made any findings on amount, having denied plaintiff's claim on the issue of liability.

As previously indicated, this claim has been the subject matter of a contracting officer's decision and two separate decisions of the Engineers Board of Contract Appeals. A reading of these decisions indicates that they have little in common, other than that they all deny the claim.

It will be recalled that the contracting officer's letter of September 19, 1958, treated by the parties as a contracting officer's decision,[9] held in effect that there were no specifications governing this work and that the welding was to be performed to the contracting officer's satisfaction. Moreover, he concluded, that with respect to acceptance, General Condition GC-19 governed over article 9(d), and that it served to postpone acceptance until after completion of the entire work.

On the other hand, the first decision of the Board of Contract Appeals, dated October 17, 1963, acknowledges that there was an acceptance, under article 9(d) of the contract, of the penstock sections "at the place of production, manufacture, or shipment." But because "the Government has shown that at least some of the defects which were repaired in the tunnel were of sufficient size to have been detected by radiographic examination and, since they were not, should be considered latent defects, the repair of which was the responsibility of the contractor." [10]

A prompt motion for reconsideration was filed, but it was not until August 20, 1965, that the Board issued a "Supplement to Decision." In this supplemental decision, the Board concludes as follows, in part:

* * * [W]e must admit error in our understanding of what a proper radiographic examination of the welded seams in the two penstocks would reveal and of the dimensions of a defect which would show on the film. We now correct our finding that there was no explanation as to why the radiograph disclosed the defect in one segment but not other defects in the same joint (Dec. p. 11) by saying probably the thickness of the defects, measured perpendicular to the face of the plate, may have been such as not to register on the x-ray film under the prescribed radiographic procedure. * * * It has been held that a defect that cannot be discovered by a reasonable inspection is a latent defect. Appeals of

---

9. As previously indicated, an appeal was taken from this decision October 20, 1958. Subsequently, on March 9, 1959, the contracting officer reiterated his decision in the form of a formal Findings of Fact, and the contractor filed a second appeal, dated April 6, 1959.

10. This quotation from the Board's decision describes a patent, not a latent, defect. United States for Use of B's Co. v. Cleveland Elec. Co., 373 F.2d 585

(4th Cir. 1967); Roberts v. United States, 357 F.2d 938, 948, 174 Ct.Cl. 940, 955 (1966); McQuagge v. United States, 197 F.Supp. 460 (W.D.La.1961); Geranco Mfg. Corp., ASBCA No. 12376, 68-1 BCA ¶ 6898; Avondale Shipyards, ASBCA No. 8375, 1963 BCA ¶ 3743; Hercules Eng'r. & Mfg. Co., ASBCA No. 4979, 59-2 BCA ¶ 2426; T. F. Scholes of Ark., ASBCA No. 5270, 59-1, BCA ¶ 2244; Arthur Venneri Co., NASA, BCA No. 52, 65-2 BCA ¶ 4976.

Dixie Printing Ink Co., ASBCA Nos. 995 and 896. Since radiographic inspection was prescribed in this case it must be presumed that this constituted a reasonable examination. It follows from this that if rejectable defects are found subsequent to acceptable results from the radiographic examination, they are properly to be considered latent defects even though the radiographic examination could not be expected to reveal them.

During the period between these two Board decisions plaintiff, on June 4, 1965, filed a protective petition in this court to guard against the running of the statute of limitations. It was a conventional petition under the Tucker Act, reciting that it would be amended or withdrawn as appropriate upon the completion of the administrative procedures. The amended petition, filed November 2, 1965, follows the format implied by the Wunderlich Act, but in addition alleges that the procedure followed by the Board "did not accord with the requirements of due process of law." It therefore asks that this court afford relief independently of those administrative decisions.

Briefly summarized, the plaintiff's procedural complaint makes these points. The aforementioned stipulation followed an offer by the plaintiff to stipulate as to all relevant facts, in an effort to expedite the appeal and to reduce expense. The sole exceptions to the stipulation related to terminology, and did not detract from its effect. After the stipulation had been filed with the Board, plaintiff offered to waive the hearing to which the contractor is entitled under the standard "Disputes" article contained in the contract. However, the Government refused to submit the case on the record, and asked for a full scale hearing, which the contractor opposed because of the time and expense it would consume, and because the Government proposed therein to contradict the contracting officer's findings of fact and the aforementioned stipulation.

The Board nevertheless granted the Government's request for a full scale

hearing and it was held in two sessions totaling 15 days, in 1962 and 1963, before two different Board members, in Los Angeles, California. Following the motion for reconsideration, which was granted after oral argument, the parties took depositions both orally and by written interrogatories in preparation for a further hearing, which took place in Washington, D. C., in June and July of 1964. At that further hearing, the presiding Board member ruled that the Government would be allowed to complete its case, but the contractor would be precluded from further cross-examination and would not be allowed an opportunity to offer any rebuttal witnesses.

Plaintiff asserted that this ruling, and the other procedures followed by the Board had manifested a bias and prejudice against the contractor and his attorney and in favor of the Government, and that the Board had not adhered to the requirement of fairness and impartiality provided by contract and by statute. Plaintiff asked that the appeal be transferred to a new panel for further proceedings, stating that the *Bianchi* decision (United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed. 2d 652) and the legislative history of the Wunderlich Act demonstrate that in this instance a departmental determination by the present panel would not be sustained nor would it accord with the standards laid down by Congress; that the court on judicial review would in any event remand the matter for further action, or conduct a trial de novo.

The Board did not answer the request for a new panel but granted partial relief by authorizing the contractor to submit depositions and written interrogatories. Plaintiff utilized this authority except for cross-examination, since it contended that under the authorized procedure, the trier of the facts would not have an opportunity to observe the attitude and demeanor of the witnesses and this appeared essential for a proper evaluation of cross-examination.

It is unnecessary to rule on this charge of a lack of procedural due process. We

conclude, prior to reaching that issue, that these administrative decisions were clearly erroneous as a matter of law; and to the extent that they may imply that the "manifestations" or indications were larger than permissible, there is no evidence to support such a finding, substantial or otherwise.

■ This is a case in which the Government clearly ordered extra work above and beyond the requirements of the contract which it had drafted, and it should reimburse the contractor therefor pursuant to the standard "Changes" clause contained in this contract. It is axiomatic that the Government warrants the sufficiency of its specifications. See, for example, United States v. Spearin, 248 U. S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Red Circle Corp. v. United States, 398 F. 2d 836, 185 Ct.Cl. 1 (1968); WRB Corp., et al. v. United States, 183 Ct.Cl. 409 (1968); Avondale Shipyards, note 10 *supra;* and Arthur Venneri Co., note 10 *supra.* The foregoing principle is ordinarily cited to support a claim by a contractor that he was put to additional expense by reason of defective or impossible Government specifications. But the rule is *a fortiori* for application, when it is the Government which is in effect questioning the sufficiency of its own specifications. In this case, it is in fact the Government which is putting in issue the sufficiency of its own specifications because the only unresolved issue of fact, and the one to which the testimony of experts was addressed, is whether the Government's original specifications were sufficient to insure the integrity of the welding in these penstocks. It was an issue raised by the Government's expert, Dr. Hoyt, after the fact and quite independently of the contract

requirements. If the Government was thereby put in doubt regarding the sufficiency of its specifications, it was in fact perfectly "reasonable" (as the Board found) for the contracting officer to order this additional work and to, in effect, upgrade these specifications, provided it paid therefor.[11]

These were typically design (and not performance) specifications.[12] They specified, in detail, the type of steel to be employed, and this steel was inspected and approved in accordance with the specifications. Welding procedures, the method of obtaining approval thereof, and the qualifications of welders, were set forth in great detail. These welding procedures, which had been successfully employed on the first three power units, were then once again approved, based on voluminous documentation submitted by the contractor in accordance with the contract. The testing and inspection requirements for the welding were set forth in great detail and were unusually stringent. They established, in effect, the performance standard to which the contractor was obliged to adhere. The tests specified to determine compliance with contract requirements, and the contract requirements, constitute an equation.[13]

These specifications required that every inch of every weld be subjected to 100 percent radiography, with a technique which would indicate the size of defects having a thickness equal to and greater than 2 percent of the thickness of the base metal. Pursuant to that test, which was much more stringent than spot radiography, for example, all of the welding was inspected and repaired one or more times until it passed Government inspection and was approved for

11. See Red Circle Corp. supra; WRB Corp., supra; and Polan Indus., Inc. ASBCA No. 3996, 58-2 BCA ¶ 1982.

12. See note 8, supra.

13. Northbridge Electronics, Inc. v. United States, 175 Ct.Cl. 426 (1966); Adams v. United States, 358 F.2d 986, 175 Ct.Cl. 288 (1966); C. H. Leavell & Co., AEC BCA No. 117, 1 G.C. ¶ 211 (1959); American Machine & Foundry Co., ASBCA No. 10772, 68-1 BCA ¶ 6900; Allied Specialties Co., ASBCA No. 10335, 67-2 BCA ¶ 6657; Elgin Nat'l. Watch Co., ASBCA No. 10421, 67-2 BCA ¶ 6400; General Motors Corp., ASBCA No. 10418, 65-2 BCA ¶ 4885; Lox Equip. Co., ASBCA No. 8985, 1964 BCA ¶ 4463; and Cameo Curtains, ASBCA No. 3574, 58-2 BCA ¶ 2051.

the final steps of sand blasting, painting, removal to and installation in the concrete tunnels.

It is absurd to suggest that under any fair interpretation of this contract the welding was then intended to be subjected to a still more stringent test based on the taking of a few random samples, and that the contractor could be required to do the entire work over again by manual welding, in the tunnel, if there were disclosed thereby smaller indications than those allowable under the stringent 100 percent radiography test.[14]

██ The simple fact is that indications or manifestations, that is, so-called "defects" having a thickness less than 2 percent of the thickness of the base metal, were just not rejectable defects within the definition of this contract.

This was not, in the parlance of today's space age procurement, a "zero defects" contract. It did not command flawless welding if, in fact, such welding exists.[15]

The welding in the case passed 100 percent radiographic inspection simply because no defects "equal to and greater than 2 percent of the thickness of the base metal" were disclosed following the inspection and reinspection process. If after acceptance, measured against that 2 percent test, the Government ordered the elimination of flaws, indications, or manifestations of smaller dimension, it was at liberty to do so, but as a change within the contemplation of the standard "Changes" article.

It is significant that the administrative decisions here under review, no-where confront the issue of whether or not these manifestations, which survived a 100 percent radiographic examination and reexamination, were in fact defects within the "equal to and greater than 2 percent of the thickness of the base metal" definition prescribed by the contract. Instead, the Board decisions recite that the contracting officer "for reasons which he deemed sufficient," ordered removal and replacement of all welds; or that "no fault can be placed on the Contracting Officer for directing the replacement of all welds which were of questionable strength by reason of any defect irrespective of how the defect was detected * * *."

At other points, the first Board decision refers to "defects which the Contracting Officer has classified as cracks," and to "the reasonableness of the Contracting Officer's decision." In the "factual" portion of this opinion, it is recited that "the action of the Contracting Officer in ordering the replacement of all questionable welds cannot be found to be arbitrary or capricious."

██ The "Disputes" article under which these Board decisions were rendered, does not countenance a rubber-stamping of the contracting officer's decision. Under the "Disputes" article, his decision enjoys no presumptive validity whatever. It is vacated by the appeal to the Chief of Engineers, or a Board representing him. The latter then owes the contractor a de novo hearing and a de novo decision based on the applicable law, the contract terms, and a preponder-

14. The defendant relies strongly on a sentence in Technical Provision 5–03b ("The Contracting Officer may also require coupons to be cut from any joint for testing") as implicitly invoking paragraph UW–52 of the ASME Boiler Code (which provides other standards for welding). But paragraph UW–52 is not referred to in any relevant portion of the contract documents, and in the light of all of those documents the contractor could not have reasonably been expected to know that UW–52 was involved at all in the testing of the welds [footnote by the court].

15. Compare Utah-Manhattan-Sundt ASB CA No. 8991, 1963 BCA ¶ 3839 involving space-age technology. Also compare Hardeman-Monier-Hutcherson, ASBCA. No. 11869, 67–2 BCA ¶ 6522. Under similar specifications for highly critical transmitter towers, defects equal to and greater than 2 percent of the thickness of the base metal were held to be acceptable in up to 15 percent of the welding. The contract specified spot radiography, rather than 100 percent radiography, as the mode of inspection.

ance of the evidence.[16] The Board cannot abdicate that responsibility by applying Wunderlich Act-type tests to the contracting officer's decision. Those tests are reserved for a court engaged in any subsequent judicial review of a Board decision.

On page 15 of its first decision, the Board correctly states:

> It does not necessarily follow that the cost of repairing the questionable welds is to be at the expense of the contractor. The primary issue presented to this Board is whether or not the Government made a change in the contract requirements by imposing a more severe inspection procedure or a more severe standard for acceptable welding than was set forth in the original contract. If such a change is found, the appellant is entitled to an equitable adjustment pursuant to the changes clause of the contract.

The opinion then cites the contractor's contention "that it was only required to produce welds that showed no defects upon radiographic examination and that this condition was satisfied when the Government inspectors checked the radiographic film at the fabricating shop." It responds to this contention merely by suggesting that there "is no adequate explanation in the record of the reason why these defects did not show up on the radiographic film." It concludes that "many of the defects uncovered after the welds had been examined and passed by radiographic examination should have been revealed by the radiographic examination."

Because it collides with the definition of a latent defect, this "should have" language is specifically reversed in the Board's supplemental decision, and that supplemental decision further finds "that the radiography technique complied with

the contract requirements." The conclusion is therefore inescapable that the Government is questioning the sufficiency of its own specifications; and that "the appellant is (in the statement of the issue above quoted from the Board's opinion), entitled to an equitable adjustment pursuant to the changes clause of the contract."

Even if one were to assume, for the sake of the discussion, that the indications found objectionable by the contracting officer were in fact rejectable under the terms of this contract, his order to replace all of the welding was a clear case of "overkill," a case of swatting a fly with a sledge hammer.[17] The contractor had pleaded for a hydrostatic test, the only contract-prescribed test remaining to be performed when the replacement order was issued, but he was denied that test. When it was finally performed, the penstocks passed the hydrostatic test without difficulty.

Similarly, the nondestructive ultrasonic test, when finally conducted by the Government, demonstrated that 97 percent of the welding was perfect, even when measured against the extra-contractual standards being imposed. And the ultrasonic test was itself a more rigorous test and established a higher standard than any imposed by the contract.

A mere suspicion does not warrant the total replacement order issued in this case.[18] The burden is clearly upon the Government, if it seeks to elevate that suspicion to the level of a fact.[19]

In its Assignment of Errors and Rebuttal, plaintiff's counsel comprehensively analyzes all of the contract and specification provisions. Read as a whole, they are consistent and harmonious. Nowhere do they countenance rejection of all of the welding, as ordered here. The

16. L. Rosenman Corp. v. United States, 390 F.2d 711, 182 Ct.Cl. 586 (1968); Davis v. United States, 180 Ct.Cl. 20 (1967); John A. Johnson Contracting Corp. v. United States, 132 F.Supp. 698, 132 Ct.Cl. 645 (1955); General Elec. Co., ASBCA No. 4865, 60-2 BCA ¶ 2705.

17. See D. R. Kincaid, Ltd., ASBCA No. 8615, 65-1 BCA ¶ 4810.

18. See Hardeman-Monier-Hutcherson, ASBCA No. 11785, 67-1 BCA ¶ 6210.

19. See note 7, *supra*.

opportunity to spotcheck by the taking of plugs is solely to insure that no defects 2 percent or larger than the thickness of the plate have escaped the 100 percent radiographic examination and taking of plugs which preceded acceptance. See footnote 14, *supra.*

All that the Board could determine with respect to the 16 samples which the Government introduced into evidence is that at least 11, in its view of the specifications, exhibited some type of defect:

> \* \* \* Of the 11 plugs exhibiting defects, 3 were taken prior to the x-ray films which were passed by the inspectors and it is understood show defects which were located by earlier x-ray exposures. Of the remaining 13 plugs, 8 show defects within the weld area which appear to be rejectable under UW-52. The remaining 5 plugs do not, to this Broad evidence, rejectable defects.

When one considers that the term "defect" as used therein in effect begs the question before the court, and that the contract even provides that the cost of sampling and repair of the sampled area is to be borne by the Government should a rejectable defect not be disclosed thereby, it is apparent that this is distressingly thin evidence upon which to bottom a total rejection of all of the welding. That is particularly true when it is recalled that the plugs were subjected to polishing, acid etching and other trauma which plaintiff's expert testified would tend to exploit any indication or manifestation into a defect.

■ Finally, even assuming that these indications, constituting no more than 3 percent of the total welding, were defects, they had passed inspection under article 9(d) of the contract and that inspection was final, as the Board held, "except as regards latent defects, departures from specific requirements of the contract,

damage or loss in transit, fraud, or such gross mistakes as amount to fraud." [20]

The stipulated facts above summarized illustrate conclusively that there was nothing latent about these indications. They were readily discoverable upon any reasonable inspection prescribed by this contract or readily available.[21] Moreover, they were at all times actually known to both parties, and the subject of discussion throughout the period that these sections were being inspected, passed, painted, and installed in the concrete tunnels.

The following paragraph from the Board's supplemental decision illustrates the dilemma thereby presented:

> Assuming, without so finding, that the defects here in question were of such a size, i. e. so small, as not to be revealed by radiographic examination conducted strictly in accordance with contract requirements, the question as to the acceptability of the work still requires resolution.

In other words, either these indications (constituting about 3 percent of the welding), were not latent defects because they were fully known, or readily discoverable by the reasonable means of inspection prescribed by the contract; or else they were not rejectable defects at all because not interdicted by the inspection and performance standards set forth in the contract. The specifications must be read to harmonize, and not conflict, with the provisions of standard contract provision 9(d).[22]

### CONCLUSION OF LAW

Plaintiff is entitled to recover, and further proceedings of this court are stayed pursuant to Rule 100 for a period of 90 days to afford the parties an opportunity to obtain an administrative resolution by the Board, or the contracting officer, of the equitable adjustment to which plaintiff is entitled under the

20. For a comprehensive administrative decision on this point, compare Gordon H. Ball, Inc., ASBCA No. 8316, 1963 BCA ¶ 3925.

21. See note 10, *supra.*

22. Morrison-Knudsen Co. v. United States, 397 F.2d 826, 184 Ct.Cl. 661 (1968).

"Changes" clause contained in the contract.[23] Further action by the court will be deferred pending the outcome of these administrative proceedings.

23. This is contrary to plaintiff's position that quantum was before the Board by reason of evidence presented by plaintiff, and that the Government waived its proof on damages by failing to cross-examine plaintiff's witnesses.

It is regrettable that this matter must be returned for further administrative action as required by United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966). Plaintiff recites in a letter to the Commissioner, dated May 9, 1966, a document filed with the Board on March 5, 1965, to this effect:

"The record demonstrates, we submit, that the contractor has been deprived of the speedy, inexpensive resolution of the dispute which it is guaranteed by General Condition 5 [Disputes], and which is the primary consideration for refusing the contractor a judicial hearing until the administrative procedure has been exhausted."

Nevertheless, we must conclude that there has not heretofore been an administrative confrontation on the issue of amount, because the Government has limited its proof and argument to the issue of liability.